**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| STATE OF NEW MEXICO, *ex rel.* Hector H. Balderas, Attorney General,<br><br>Plaintiff,<br><br>v.<br><br>GILEAD SCIENCES, INC., GILEAD SCIENCES, LLC (F/K/A BRISTOL-MYERS SQUIBB & GILEAD SCIENCES, LLC), BRISTOL-MYERS SQUIBB, and TEVA PHARMACEUTICALS USA, INC.,<br><br>Defendants. | Case No.  1:21-cv-00255 |

## DEFENDANT GILEAD SCIENCES, INC.'S NOTICE OF REMOVAL

Defendant Gilead Sciences, Inc. hereby removes this action, Case No. D-101-CV-2021-00377 in the First Judicial District Court, County of Santa Fe, New Mexico, to this Court under 28 U.S.C. § 1441(a) (removal of civil actions).  Removal is proper based on the original subject-matter jurisdiction of this Court under 28 U.S.C. § 1331 (federal question).  This removal comports with 28 U.S.C. § 1446 (procedure for removal of civil actions).

Plaintiff's Complaint is a copycat of nationwide class actions filed in 2019 and 2020 in the United States District Court for the Northern District of California:  *Staley et al. v. Gilead Sciences, Inc. et al.*, No. 3:19-cv-2573 (N.D. Cal.); *FWK Holdings, LLC v. Gilead Sciences, Inc. et al.*, No. 3:20-cv-06793 (N.D. Cal.); *KPH Healthcare Services, Inc. v. Gilead Sciences, Inc. et al.*, No. 3:20-cv-06961 (N.D. Cal.).  Additional related cases have been consolidated under the *Staley* action, and the related *KPH* and *FWK* actions are coordinated with the *Staley* action.  *See Staley*, No. 3:19-cv-2573, ECF No. 92 (consolidating four actions), ECF No. 265 (consolidating

"a transferred related action"), ECF Nos. 356, 453 (coordinating *KPH* and *FWK* actions). Each of these federal actions assert subject-matter jurisdiction based on, among other provisions, 28 U.S.C. § 1331 (federal question).

Plaintiff and its counsel have engaged in a strategy to construct the Complaint to circumvent federal-court jurisdiction. This strategy fails because federal subject-matter jurisdiction exists over this action, making the action removable.

In further support of this Notice of Removal, Defendant Gilead Sciences, Inc. provides the following non-exhaustive summary of the grounds for removal:

## TIMELINESS OF REMOVAL

1. On February 24, 2021, Plaintiff commenced this action by filing its Complaint in the First Judicial District Court, County of Santa Fe, New Mexico, Case No. D-101-CV-2021-00377, against Defendants.

2. Plaintiff served a summons and a copy of the Complaint on Defendant Gilead Sciences, Inc. on March 19, 2021. Upon information and belief, Defendants Gilead Sciences, LLC (f/k/a Bristol-Myers Squibb & Gilead Sciences, LLC), Bristol-Myers Squibb, and Teva Pharmaceuticals USA, Inc. have not been served to date. This Notice of Removal is therefore timely under 28 U.S.C. § 1446(b) (requiring the filing of notice of removal within 30 days). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999) (holding that service of process triggers the 30-day period in which to file notice of removal).

## VENUE

3. For purposes of removal, venue is proper in this Court because the District of New Mexico is "the district and division embracing the place where such action is pending."

28 U.S.C. § 1441(a).

## CONSENT

4. Pursuant to 28 U.S.C. § 1446(b)(2)(A), only defendants "who have been properly joined and served must join in or consent to the removal of the action." As of the filing of this Notice, Plaintiff has only served Gilead Sciences, Inc. Upon information and belief, Plaintiff has not served Gilead Sciences, LLC, Bristol-Myers Squibb, or Teva Pharmaceuticals USA, Inc. Accordingly, the requirements of 28 U.S.C. § 1446(b)(2)(A) are met here.

## THIS COURT HAS FEDERAL-QUESTION JURISDICTION

5. Under 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Whether a case "arises under" federal law is be determined based on the contents of a "well-pleaded complaint." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9-10 (1983).

6. A "longstanding . . . variety of federal 'arising under' jurisdiction" is when state-law claims "implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). The Supreme Court has recognized this category of federal-question jurisdiction "for nearly 100 years." *Id.*; *see Franchise Tax Bd.*, 463 U.S. at 9 (observing that the Court has "often held that a case 'arose under' federal law where the vindication of a right under state law necessarily turned on some construction of federal law").

7. In determining whether claims arise under federal law, courts consider whether a federal issue is: (1) "necessarily raised," (2) "actually disputed," (3) "substantial," and (4) "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see Grable*, 545 U.S. at 314.

8.      Federal subject-matter jurisdiction exists so long as any one claim depends on the resolution of a substantial federal issue. *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1138 (10th Cir. 2014) ("[F]ederal jurisdiction over any one claim is sufficient to support removal."); *Gilmore v. Weatherford*, 694 F.3d 1160, 1176 (10th Cir. 2012) ("[I]f any one claim within Plaintiffs' complaint supports federal question jurisdiction, a federal court may assert jurisdiction over all the claims, including any alleged state-law claims, arising from the same core of operative facts."); *Cty. of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1025-26 (N.D. Cal. 2005) ("[E]ven if only one of the claims falls under federal-question jurisdiction, all may be heard here.").

9.      The Complaint raises multiple substantial questions of federal law. On the face of the Complaint, not just one claim, but each of Plaintiff's claims under New Mexico's Antitrust Act and Unfair Practices Act implicates substantial federal questions that are disputed and necessarily turn on the analysis, interpretation, and application of federal patent, drug regulatory, and Medicaid laws. Generally, and as more fully set forth below, Counts I and V against Gilead and Teva are antitrust claims concerning alleged "sham" patent litigation under the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355(j), in the U.S. District Court for the Southern District of New York and settlements thereof; Counts II and VI against Gilead and BMS are antitrust claims concerning their joint-venture agreement for Atripla and the potential for competitors to invalidate patents and obtain approval by the U.S. Food and Drug Administration ("FDA") for generic drugs; Counts III and IV against Gilead are antitrust claims challenging Gilead's alleged delay in developing and launching FDA-approved tenofovir alafenamide fumarate ("TAF") and pre-exposure prophylaxis ("PrEP") products, and the

allegedly "false" and "fraudulent" promotion of FDA-regulated products; and Count VII against all Defendants is an Unfair Practices Act claim challenging the same conduct.  Further, Plaintiff seeks damages and other relief for reimbursements allegedly paid pursuant to the federal Medicaid scheme.

### A. Plaintiff's Claims Necessarily Raise Substantial Federal Issues Concerning Patent Validity and Infringement Under Federal Patent Law.

10. "Since the Patent Act of 1800, Congress has lodged exclusive jurisdiction of actions 'arising under' the patent laws in the federal courts, thus allowing for the development of a uniform body of law in resolving the constant tension between private right and public access." *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 162 (1989); *see* 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . .  No State court shall have jurisdiction over any claims for relief arising under any Act of Congress relating to patents.").  Each of Plaintiff's claims here necessarily turns on substantial questions of federal patent law.

11. Plaintiff alleges that, but for the settlement of the Gilead-Teva patent litigation in the U.S. District Court for the Southern District of New York, Teva would have won the patent litigation and generic entry would have occurred earlier in time. *See, e.g.*, Compl. ¶¶ 115-17, 200-01.  Indeed, the Complaint is rife with allegations that the patents at issue are invalid and the federal patent litigation was a "sham" and "baseless." *See, e.g.*, Compl. ¶ 12 (alleging "sham patent litigation against generic manufacturers"); ¶ 113 ("Knowing its patents were weak and likely to be invalidated, Gilead filed baseless patent infringement litigation . . . ."); ¶ 201 ("Gilead filed its Truvada and Atripla patent infringement lawsuits knowing the patents were weak, without regard to the merits, and fully anticipating that generic manufacturer(s) would

bring successful patent challenge(s) and imminent generic competition."); *see also* ¶¶ 39-40, 184, 205-06, 249, 253, 320 (alleging "sham" or "baseless" patent litigation). The Complaint, for example, re-asserts the patent invalidity arguments Teva raised in the federal court patent litigation—relying on federal patent law—to argue that the patents at issue are obvious and anticipated. *See, e.g.*, Compl. ¶ 116 (citing Teva's Pre-Trial Mem., *Gilead v. Teva*, No. 1:10-cv-1796 (S.D.N.Y. Jan. 28, 2013), ECF No. 112 and *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1362 (Fed. Cir. 2007)); ¶ 204 (citing Teva's Mem. in Opp. to Pre-Trial Mem., *Gilead v. Teva*, No. 1:08-cv-10838 (S.D.N.Y. Sept. 23, 2013), ECF No. 152).

12. Plaintiff's other claims also necessarily turn on federal patent law. For example, Plaintiff alleges that "[a]bsent Gilead's and BMS's [joint-venture] agreement . . . an unrestrained competitor in BMS's position would have challenged Gilead's patents and entered the market with a competing FDC [fixed-dose combination medication]." Compl. ¶ 247; *see also id.* ¶ 250 ("BMS's patents . . . [are] weak and likely to be found invalid."); ¶ 253 ("BMS (and Gilead's counsel of record) filed the baseless Atripla EFV patent infringement lawsuit without regard to the merits—knowing the EFV Patents were weak and likely to be invalidated."); ¶ 254 ("EFV Patents were thus inherently anticipated and/or obvious and invalid" (citing Teva's Mem. in Opp. to Pls.' Opening Pretrial Br., *Merck Sharp & Dahme Corp., et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. l:10-cv-01851 (S.D.N.Y. May 28, 2013), ECF No. 96)); ¶ 263 ("[A]n untainted competitor in BMS's position would have challenged Gilead's patents and entered the market with a competing FDC even before the expiration of the FTC patents in 2021.").

13. Likewise, the Complaint's theory that Gilead allegedly delayed in launching TAF-based HIV treatments is also premised on the same federal patent-validity issues. *See, e.g.*,

Compl. ¶ 305 ("Gilead decided to abandon its efforts with TAF and instead enter into a collusive collaboration with BMS to fraudulently insulate its weak and vulnerable TDF and FTC Patents . . . ."); ¶ 320 ("Gilead held on to its TAF design for over a decade, knowing it could extend the longevity of its TDF-Based HIV franchise . . . [by] filing sham patent litigation").

14. Additionally, Plaintiff's claims turn on substantial federal issues concerning the U.S. government's alleged patent rights related to PrEP.  Plaintiff alleges that "Gilead intentionally postponed research and development regarding the use of tenofovir for PrEP indications in order to free-load and take unfair advantage of ground-breaking government research funded by [federal] taxpayer dollars." Compl. ¶ 305.  As a result, Plaintiff asserts that "Gilead's sales of Truvada and Descovy for PrEP allegedly infringes on four of the [federal] government's patents covering research relating to tenofovir (TDF/TAF) and FTC regimes." Compl. ¶ 312; *see also id.* ¶ 312 n.68 (citing the U.S. government's federal patent suit against Gilead).  Plaintiff further alleges that "Gilead has unfairly profited from [federal] taxpayer dollars that funded government clinical research for the use of Truvada and Descovy in a PrEP regime" (*id.* ¶ 17), and that "Gilead has yet to obtain licenses to the [federal] government's patents or pay the government reasonable royalties for the use of its novel discoveries relating to tenofovir for PrEP" (*id.* ¶ 306); *see also id.* ¶ 309 (alleging reliance "on [the federal] government issued patents and research without payment of reasonable royalties to achieve those objectives, has injured government payors").

15. Given these and other allegations in the Complaint, removal is proper because such substantial federal patent issues are essential to and form the basis of Plaintiff's state-law claims.  *See Grable*, 545 U.S. at 315.  These federal patent issues are substantial because, among

other reasons, they directly affect an area reserved for exclusive federal jurisdiction, involve aspects of a complex federal regulatory scheme, implicate patent rights related to existing and future HIV and other treatments, and implicate alleged patent rights of the U.S. government related to PrEP. *See id.* at 313. Plaintiff also seeks broad injunctive relief that, if granted, would have nationwide implications concerning the resolution of federal patent litigation and the ongoing sale of numerous HIV treatments throughout the United States. *See* Compl. ¶ 434 ("Plaintiff seeks injunctive relief in the form of an order requiring Defendants to cease the unlawful and unfair practices described herein.").

> **B.    Plaintiff's Claims Necessarily Raise Substantial Federal Issues Concerning the Hatch-Waxman Act and the Nationwide FDA Regulatory Scheme.**

16.    Each of Plaintiff's claims here necessarily turns on substantial federal questions under the Hatch-Waxman Act and the FDA's nationwide prescription-drug regulatory scheme. The Complaint cites and relies on both extensively: "The Drug Price Competition and Patent Term Restoration Act of 1984 – more commonly referred to as the 'Hatch-Waxman Act' – is codified at 21 U.S.C. § 355(j)." Compl. ¶ 85. Leveraging the Congressional intent behind the Act, the Complaint asserts: "The stated purpose of Hatch-Waxman is to strike a balance between rewarding genuine innovation and drug discovery by affording longer periods of brand drug marketing exclusivity while at the same time encouraging generic patent challenge and streamlining generic drug competition . . . ." Compl. ¶ 86.

17.    Borrowing from and copying the federal antitrust complaints pending in the Northern District of California, the Complaint proceeds in the patent-settlement claims to assert that "Gilead included 'most-favored entry' ('MFE') provisions in its patent settlements . . . to entice Teva to delay entry of its generic" product. Compl. ¶ 139. The MFE allegation

necessarily depends on the interpretation and application of federal law governing drug approval and exclusivity:

> [T]he *Hatch-Waxman Amendments* leave open at least two pathways for second-filers to enter the market before a first-filer that has agreed to delay entry into the market. The second-filer could win the patent litigation and trigger forfeiture of the first-filer's statutory exclusivity when it fails to enter the market within 75 days of the court decision; and the second-filer could negotiate an earlier entry date from the brand manufacturer and enter the market if the first-filer has forfeited statutory exclusivity by having failed to get FDA approval within 30 months. *MFEs can potentially close the two pathways to earlier generic entry that Congress left open.* This is particularly disconcerting here, where *legislative intent* clearly calls for expedited review and approval of critical antiretroviral medications for the treatment of HIV and where challenging weak patents could bring such products to the market more quickly.

Compl. ¶ 143 (emphasis added). The Complaint goes on at length as to how its challenge to the Most Favored Entry clauses (which on their face accelerate, not delay, generic entry) are in Plaintiff's view tethered to the Congressional policy embodied in the Hatch-Waxman Act. *See* Compl. ¶¶ 93-94 (describing Hatch-Waxman Act's generic-approval pathways and exclusivity and forfeiture provisions (citing 21 U.S.C. § 355(j)(5)(B)(iv), 21 U.S.C. § 505(j)(5)(D)(i)(I)(aa)-(bb)); ¶ 149 ("The FD&C Act's forfeiture provisions created the prospect that, if Teva agreed to a long delay in entry, without the protection of MFEs, a second-filer would" have had the ability to launch earlier); ¶ 217 ("Teva receiving MFEs would dissuade the second-filers from continuing to litigate and would provide Teva a period of exclusivity" when "Teva had forfeited its 180-day ANDA exclusivity." (citing 21 U.S.C. § 355(j)(5)(D)(i)(I)(aa)(BB))).

18. Moreover, as part of its "reverse payment" theory, the Complaint sets out the unsupported contention that Gilead and Teva perpetrated some sort of sham filing with the Federal Trade Commission in violation of the federal Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("the Medicare Modernization Act"). The Complaint alleges

9

that the Medicare Modernization Act requires the parties to such patent-litigation settlements to disclose "the terms of the settlements to the FTC and the U.S. Department of Justice," and that the Federal Trade Commission took a direct role in shaping the final settlement terms here. Compl. ¶¶ 121-24; *see also* Compl. ¶¶ 125-26 (alleging misrepresentations to the FTC and the federal judge overseeing the patent litigation about settlement terms to "solidify[] an exclusive and favorable launch for Teva"); ¶¶ 134-36 (alleging the settlement provided "Teva would be granted exclusive entries into the market").

19.     Additionally, Plaintiff's allegations of generic delay related to the Atripla joint-venture agreement and Gilead's alleged delay in launching TAF-based and PrEP-indicated products are also predicated on determinations about approval by the Federal Drug Administration and pharmaceutical exclusivity under federal law.  For instance, Plaintiff alleges that absent the joint-venture agreement it "would have been in Gilead's and BMS's economic interest to market a competing generic-drug-based or comparable-drug-based FDCs as soon as possible."  Compl. ¶ 244; *see also id.* ¶ 247 ("Absent Gilead's and BMS's agreement . . . an unrestrained competitor in BMS's position would have . . . entered the market with a competing FDC."); ¶ 272 (alleging "generic Atripla and/or a generic comparable FDC would have been available much earlier").  Plaintiff similarly alleges that Gilead could have launched its TAF and PrEP products earlier in time.  *See, e.g.*, Compl. ¶ 278 ("Gilead purposefully and deliberately delayed its development and introduction of safer and more effective TAF" and "delayed its development and clinical research for PrEP HIV Medications"); ¶ 281 ("Such schemes allowed Gilead to delay PrEP research and further substantially delay the introduction of TAF and TAF-Based Descovy.").

20.     Any determination of whether a competing generic version of Atripla or the TAF and PrEP products could have launched earlier in time, as Plaintiff alleges, necessarily turns on the interpretation and application of federal drug approval and exclusivity laws and regulations. *See, e.g.*, Compl. ¶¶ 74-77 (describing the federal regulatory approval scheme under "the Hatch-Waxman Act, 21 U.S.C. §§ 355(j), *et seq.*, which was enacted by Congress" and asserting that HIV/AIDS treatments may be reviewed by the FDA "under 21 C.F.R. §§ 314.500, *et seq.*, under expedited review provisions"); Compl. ¶ 263 (alleging Atripla competition "subject to that NCE exclusivity"); Compl. ¶ 300 (describing Gilead's alleged use of the Hatch-Waxman Act's exclusivity scheme to "delay in the ability of generic manufacturers and other competitors to challenge Gilead's TAF-related patents").  Such determinations would also directly implicate the federal regulatory pathway available for future competing HIV and other pharmaceutical treatments.

21.     The Complaint further asserts that Defendants engaged in fraudulent marketing and promotion of FDA-regulated HIV treatments.  *See, e.g.*, Compl. ¶ 265 (alleging "Gilead and BMS engaged in fraudulent marketing"); ¶ 324 (alleging "false and fraudulent promotional materials"); ¶ 334 (alleging fraudulent "Gilead-generated or funded materials").  To determine whether such promotional materials were "false" or "fraudulent" necessarily turns on the interpretation and application of federal law. *See, e.g.*, 21 C.F.R. § 202.1(e)(5)-(7) (regulating marketing and promotional materials for FDA-approved drugs and defining the parameters of a "true statement" as well as representations that are "false, lacking in fair balance, or otherwise misleading").  Conversely, New Mexico's Unfair Practices Act provides that "[n]othing in the Unfair Practices Act shall apply to actions or transactions *expressly permitted* under laws

administered by a regulatory body of New Mexico *or the United States* . . . ." N.M. Stat. Ann. § 57-12-7 (emphasis added).

22. Given these and other allegations in the Complaint, removal is proper because such substantial federal drug-regulatory issues are essential to and form the basis of Plaintiff's state-law claims. *See Grable*, 545 U.S. at 315. These drug-regulatory issues are substantial because, among other reasons, they directly affect an area reserved for exclusive federal jurisdiction, involve aspects of a complex federal regulatory scheme, implicate FDA-drug exclusivity, approval, and other pathway issues related to existing and future HIV and other treatments, and implicate how FDA-regulated products may be promoted. *See id.* at 313. Plaintiff also seeks broad injunctive relief that, if granted, would have nationwide implications concerning the federal drug-regulatory scheme and the ongoing sale of numerous HIV treatments throughout the United States. *See* Compl. ¶ 434.

### C. Plaintiff's Claims Necessarily Raise Substantial Federal Issues Concerning the Federal Medicaid Scheme, Implicating Government Payors Nationwide.

23. Plaintiff seeks damages and other relief related to Medicaid reimbursements for allegedly "over-priced HIV Medications." Compl. ¶ 3 (alleging the "net result of Gilead's and other Defendants' unlawful actions resulted in unwarranted and excessively over-priced HIV Medications costing the State millions of dollars in drug reimbursements"); ¶¶ 363, 375, 386, 397, 409, 420, 441 (Counts I-VII alleging injury in the "form of reimbursements" or "direct reimbursements" or "claims for reimbursement"). These reimbursement claims necessarily turn on substantial questions of federal law.

24. "The New Mexico Medicaid program is administered pursuant to regulations promulgated by the federal department of health and human services under Title XIX of the

Social Security Act as amended and by state statute." N.M. Code R. § 8.302.1.3. For example, for the cost of a particular drug to be covered by Medicaid, the pharmaceutical "manufacturer must have entered into and have in effect a rebate agreement" with the Secretary of Health and Human Services, which is subject to various federal compliance and drug-pricing requirements. *See, e.g.*, 42 U.S.C. § 1396r-8(a) (requirement for rebate agreement), § 1396r-8(b)(3) (manufacturer provision of price and drug-production information), § 1396r-8(c) (determination of amount of rebate and "best price"). The interpretation and application of these drug-pricing requirements, among other federal regulations, are necessary to resolve Plaintiff's reimbursement claims for allegedly "over-priced HIV Medications."

25. Moreover, the federal Medicaid program *requires* participating states to cover and pay reimbursements for prescription drugs of any manufacturer, like Defendants, that enter into and comply with a federal Medicaid rebate agreement. 42 U.S.C. § 1396r-8(d)(4)(B). The federal Ryan White HIV/AIDS Program similarly mandates the coverage of "core antiretroviral therapeutics" like those at issue here. 42 U.S.C. § 300ff-26; *see* Compl. ¶ 64 (stating that New Mexico participates in the "Federal Ryan White HIV/AIDS Program"). Despite these and other federal mandates, Plaintiff asserts that it "will not pay for claims tainted by violation" of state law (Compl. ¶ 67), that "Medicaid reimbursement claims made in violation of the State's statutes, regulations and requirements are material to the State's decision to pay for those claims" (*id.* ¶ 68), and "[a]s a result of Gilead's anticompetitive and deceptive conduct, the State reimbursed or paid for thousands of HIV Medication prescriptions" (*id.* ¶ 70). Determining the extent that the Plaintiff may, if at all, refuse to "reimburse[] or pa[y] for thousands of HIV Medication prescriptions" that are mandated by federal law and subject to a Medicaid rebate

agreement with the Secretary of Health and Human Services necessarily raises a substantial federal question.

26. Plaintiff acknowledges that these substantial federal issues are not limited to New Mexico's Medicaid program but extend to and have significant implications for government payors nationwide: "U.S. government payors, including State Medicaid programs, are one of the single largest sources for insurance coverage and accessibility to antiretroviral medications for people living with HIV." Compl. ¶ 5; *see also id.* ¶ 56 (alleging conduct "directly impacting (and increasing) reimbursements made by government payors, like the State"); *id.* ¶ 304 (alleging "government payors, like the State, have been presented with claims for reimbursement for artificially high . . . HIV Medications"); ¶ 309 (alleging "injured government payors, including the State"). Indeed, the federal government itself "pays between 50% and 83% of the costs the State incurs" under Medicaid. *Ark. HHS v. Ahlborn*, 547 U.S. 268, 275 (2006). And New Mexico's "HIV/AIDS Services, Care & Treatment program . . . [is] co-funded by the Federal Ryan White HIV/AIDS Program . . . ." Compl. ¶ 64 (citing the Ryan White HIV/AIDS Treatment Extension Act of 2009 (Public Law 111-87)).

27. Given these and other allegations in the Complaint, removal is proper because such substantial federal reimbursement issues are essential to and form the basis of Plaintiff's state-law claims. *See Grable*, 545 U.S. at 315. These Medicaid-reimbursement issues are substantial because, among other reasons, they directly affect an area reserved for exclusive federal jurisdiction, involve aspects of a complex federal regulatory scheme, implicate significant federal funding, and have widespread implications for when, and if at all, a state may reject Medicaid coverage and reimbursements for federally covered treatments. *See id.* at 313.

As noted, Plaintiff also seeks broad injunctive relief that, if granted, would have nationwide implications concerning the federal-Medicaid scheme and the ongoing coverage of numerous HIV treatments throughout the United States.  *See* Compl. ¶ 434.

*     *     *

As set forth above, Plaintiff's state-law claims necessarily turn on multiple substantial questions of federal law, justifying "resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable*, 545 U.S. at 312.  Removal to address these substantial federal issues does not "disturb[] any congressionally approved balance of federal and state judicial responsibilities."  *Id.* at 314.  Rather, Plaintiff's strategy to evade federal court invites other courts to reach differing interpretations of these federal issues, including in the U.S. District Court for the Northern District of California where several related cases are already pending and which include New Mexico Antitrust Act and Unfair Practices Act claims.  "A plaintiff is not permitted 'to cloud' the nature of his complaint by artificial or incomplete characterizations intended to avoid an inherent federal question."  *Acoma Pueblo v. Am. Tobacco Co.*, 2001 U.S. Dist. LEXIS 27565, at *14 (D.N.M. Feb. 20, 2001) (citing *Cisneros v. ABC Rail Corp.*, 217 F.3d 1299, 1304 (10th Cir. 2000)); *see Star Varga v. United Airlines*, 2009 U.S. Dist. LEXIS 64000, at *11 (N.D. Cal. July 24, 2009) (explaining that a plaintiff cannot avoid federal jurisdiction with "'artful pleading,' attempt[ing] to defeat the defendant's right to a federal forum" (citing *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 397 n.2 (1981))).

Pursuant to 28 U.S.C. § 1446(a) and D.N.M.LR-Civ. 81.1(a), Defendant Gilead Sciences, Inc. attaches as Exhibit A copies of all process, pleadings, orders and copies of any other records

or proceedings filed in the First Judicial District Court of Santa Fe County.  In accordance with 28 U.S.C. § 1446(d), Defendant Gilead shall file a copy of this Notice of Removal with the Clerk of the First Judicial District Court of Santa Fe County and provide written notice to Plaintiff.  *See* Exhibit B.

Dated:  March 23, 2021                     Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS
   & SISK, P.A.

By: */s/ Michelle A. Hernandez*
   Michelle A. Hernandez
   Post Office Box 2168
   500 Fourth Street NW, Suite 1000 (87102)
   Albuquerque, New Mexico  87103-2168
   Telephone: 505.848.1800
   mah@modrall.com

*Attorney for Defendant Gilead Sciences, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and accurate copies of Gilead Sciences, Inc.'s Notice of Removal was forwarded this 23rd day of March 2021, by email and first class U.S. Mail, postage prepaid to:

    Brian L. Moore
    P. Cholla Khoury
    Assistant Attorneys General
    201 Third Street NW, Suite 300
    Albuquerque, NM  87102
    (505) 717-3500
    bmoore@nmag.gov
    ckhoury@nmag.gov

    Marcus J. Rael, Jr.
    Robles, Rael and Anaya, P.C.
    500 Marquette Ave. NW, Suite 700
    Albuquerque, NM  87102
    (505) 242-2228
    marcus@roblesrael.com

    *Attorneys for Plaintiff*

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By:   */s/ Michelle A. Hernandez*
      Michelle A. Hernandez